MERCHANT *vs.* MERCHANT.

*In the Matter of the Estate of* AARON MERCHANT, *deceased.*

THE testator, having made an unequal will, gave to his son, during his last
illness, three bonds. Subsequently, having executed another will, plac-
ing the donee nearly on an equal footing with his *sisters,* the bonds
were brought to him by his wife, with whom the donee had deposited
them; and he directed them to be put back in the box where he kept
his valuable papers. The day before his death he directed one of his
daughters to bring him the box, and see if the bonds were there. They
were shown to him: he said it was right, directed them to be replaced,
the box to be locked, and the key to be given, on his decease, to R., one
of his executors,—*Held,* as the gift was made during the last illness,
from which the testator did not expect to recover, that by presump-
tion of law, it was intended as a *donatio mortis causâ,* was revocable in
its nature, and was in fact revoked before the donor's death.

A will does not revoke a gift *causâ mortis;* because the will does not speak
till the testator's death—the moment the donation by its terms has be-
come absolute.

A *donatio mortis causâ* is revocable at the option of the donor and without
the consent of the donee, whether the donor recover or not.

There are three conditions annexed by law to a gift *causâ mortis,* which
on happening defeat the donation: the recovery of the donor, his
repentance of the gift, and the death of the donee before the donor's
decease.

On an accounting, the Surrogate has jurisdiction to try every question
necessary to the settlement of the accounts. The legatees can adduce
evidence to charge the executor with more assets than he acknowledges
to have received; and it is competent for him, on the other hand, to show
in defence that the assets were his own property, and not part of the
testator's estate, at the time of the death.

THOS. W. HIGGINS, *for W. H. Merchant.*

I. The Surrogate has no right by the revised statutes to
try this case, as it involves the trial of a disputed claim.

(*Magee* vs. *Vedder*, 6 *Bar.*, *p.* 352; *Opinion of D. B. Ogden In the Matter of the Estate of John Kent, deceased, Dayton's Surrogate, Appendix, p.* vii.; *5th N. Y. Legal Observer, p.* 124.)

II. To constitute a valid *donatio mortis causâ* there must be a transfer of the dominion over the subject of the gift. (*Wms. on Ex., p.* 654.) The dominion over the subject of the gift is acquired by donee immediately on the delivery and acceptance of the gift. (See *Reddel* vs. *Dobree*, 10 *Simons, p.* 244.)

III. If the donee acquires dominion over the subject of the gift, it is a contradiction of terms to suppose that donor continues his right to control it: donor cannot recall the gift at will. (See *Reddel* vs. *Dobree*, 10 *Simons, p.* 244.)

IV. The doctrine that a gift *mortis causâ* is revoked by the resumption of possession, is nowhere found in our elementary works on this subject.

The only authority for the doctrine that " Resumption of possession by donor is a revocation of the gift," is found in the case of *Ward* vs. *Turner*, 2 *Ves. sen., p.* 431. This is the case referred to by all writers that hold this doctrine. The case referred to in 2*d Vesey* will admit of no such construction. Lord Hardwicke held, that because the donee did not " regard and take care of the gift," and thus suffered it to return to donor, the gift was revoked.

V. Possession must be resumed by donor with the knowledge and consent of donee; otherwise, donee has not parted with his right to dominion over the subject of the gift.

VI. A *donatio mortis causâ* is unlike a will, in that it takes effect immediately on delivery. (*Wms. on Ex., p.* 658.)

VII. A *donatio mortis causâ* is *like* a will, revocable, but it is not revocable *as* a will.

VIII. A *donatio mortis causâ* is revocable only in four ways.

1st. By death of donee before death of donor.

2d. By the recovery of donor from his then sickness.

3d. By the birth of a subsequent heir.

4th. By the resumption of the possession of the gift, which must be done with the knowledge and consent of donee.

IX. A gift *mortis causâ* differs from a nuncupative will, inasmuch as there must be a *delivery* of the subject; and the effect of the delivery is that it takes away the *locus penitentiæ* from donor; and the only way in which the gift can be recalled or revoked is by one of the four ways mentioned above.

X. The right of dominion over the bonds in question was never parted with by donee; and their possession was never legally resumed by donor, as donee never knew that donor had them in his possession, but always supposed that he had them in his own possession.

---

HORACE HOLDEN *and* ROBERT DODGE, *for Legatees.*

I. There is no legal evidence of any gifts whatever of the bonds claimed by the executor, William H. Merchant.

Whatever effect may be given to declarations of legatees, they must be distinctly proved; and if the declarations of several legatees are offered, it must first be proved that they were all together when made, and that they spoke the same thing together, before you can, as attempt-

ed here, admit such a random statement as made by the witness Reading, "Mrs. and Mary Eliza Merchant both told me:" &c.

(*a*) There is no evidence offered of any facts and circumstances of these declarations, no date given, no words proved, no evidence that they saw or heard the testator make any gift, no time stated of any gift; and the whole evidence offered is comprised in the words of the witness, "I understood that it was a full and free gift," &c., without stating any source of such understanding; and as to the other daughter, Selina, who is sought to be charged also by the alleged declaration of the mother and sister, the witness says, "I don't know that she knew of the gift."

*Thompson* vs. *Heffernan*, 4 *Drury & Warren*, *p.* 285 (1843), by Sugden, "To support such a disposition, I should require *not* a *mere general statement* of the fact of a *gift having been made*, but to be informed of the most minute particulars,—the amount, how it was given, when, where, and in whose presence, and in what condition of mind and body the alleged donor was; in fact, all such particulars as might be expected in a *fair transaction.*"

This evidence is merely confused hearsay. (*Walsh* vs. *Studdart*, 4 *Drury & Warren*, 171; *Walter* vs. *Hodge*, 2 *Swanston*, 97.)

"On principle, it is quite clear that a claimant insisting on such a parol gift, must establish a clear and satisfactory case. The court expects satisfactory evidence of an act constituting a transfer of the property." (*Shirley* vs. *Whitehead*, 1 *Iredell's Eq.*, 130.) "A gift by a man in his last sickness, to a person in attendance upon him, will be viewed with suspicion, and will not be sustained without full and conclusive evidence."

II. There is no proof of delivery. To make out any gift of these bonds, delivery must be positively proved, and fully as to time and manner.

The only evidence of delivery is this : the same witness testified " hearing that these bonds had been in his possession, I infer there was a delivery." " William H. came home a day or two after the 1st of December, and that is the reason why I fix the gift after that time. I cannot tell at what time the gift was made. The testator never said anything to me about these bonds."

Nothing is better settled than that this claimant, an executor, and therefore a trustee of the personalty under the will, must make out his claim fully in all the circumstances; otherwise, a door would be opened to perjury and fraud, greater than the statutes have provided against. (*Jones* vs. *Selby*, *Finch's Prec. in Ch.*, 300, and the cases cited on Point I.)

He must produce competent legal evidence. His own oath, in any way cannot be taken. It is like the case of an executor claiming to retain for his own debt or claim.

" To constitute a valid gift, there must be a delivery of the subject ; and in such circumstances that donor prefers the possession to the donee. There must be an absolute and unconditional delivery of possession to donee, and the possession of donee must continue until the death." (2 *R. S.*, 88, § 35 ; 6 *Paige*, 166 ; *Farquharson* vs. *Cave*, 2 *Collyer*, *p.* 356, *Shadwell*, *V. C.*)

To constitute a delivery, " the donor must not only part with the possession, but with the dominion of the property." (2 *Kent*, 438. 2 *Gill & Johnson*, 508 ; 5 *Ibid*, 54." *Bunn* vs. *Markham*, 7 *Taunton*, 224 ; *Walter* vs. *Hodge*, 2 *Swanston*, 106 ; *Hawkins* vs. *Blewit*, 1 & 2 *Esp N. P. C.*, 663).

A gift resting *only* in *mental intention*, and not perfected by an *entire* delivery of dominion and control, is *not* a gift. There exists *locus penitentiæ*, and no court will aid to carry it out. (2 *Kent's Com.*, 438).

The delivery rests on the inference from unknown premises by the witness Reading.

There is no evidence of any possession by donee before the death, or of any delivery.

That delivery is essential, and must be fully and clearly proved by claimant, and its legal character. See 2 *Kent's Com.*, 438, 9, 446; 1 *Williams' Ex'rs*, 500; 1 *Roper's Legacies*, *p.* 4; 10 *Simons*, 244; *Bunn* vs. *Markham*, 7 *Taunton*, 224; *Bryson* vs. *Brownrigg*, 9 *Ves.*, 1; 1 *Roper*, *p.* 6; *Edwards* vs. *Jones*, 1 *Mylne & Craig*, 226.

III. *But assuming* there was a *gift of these bonds* by the testator to his son, some time between the 1st and 16th days of December, 1851,—

The witnesses, Reading, Hewitt, and Dr. Palmer, his attending physician, all unite in proving that during that fortnight, and the month of December, 1851, the testator was prostrated with his *last illness*, of which he died 8th January, 1852. That the testator uniformly *expressed his belief that he should positively and speedily die of that illness; that he was continually under the belief of the near approach of death*, of which he frequently conversed, and of a *future state*.

This evidence clearly shows this alleged gift to have been *mortis causâ*. There is no evidence of the contrary.

The definition of *donatio mortis causâ* by Roper, which is uniformly adopted by all authors, being the definition of the Pandects of Justinian, is, "Where a person, being in peril of death, in *prospectu mortis*, or during his last illness, gives something, *yet not so that it should be presently his* who received, but in case only the giver die."

"But it is not necessary for the donor to expressly declare that the gift was made conditionally, viz., to take effect only in the event of his death; for if the gift be made during his last illness, the law infers the condition that the donee is only to hold the subject in case the donor die of that indisposition.

"The donee must either continue in possession of the

subject from its delivery till the *death of the donor or by redelivery be in possession* of it at *the time of death of donor*, consequently if the *donor resume the possession and continue it until his decease*, the gift will be revoked, and for the following reason; the gift *not being made to take effect immediately*, but being *inchoate*, dependent on the event of the donor's death, *locus pœnitentiæ* was reserved to him, of which *change of mind the resumption of possession being evidence*, determined the donation."

"Nothing can be more clear than that this *donatio mortis causâ* must be a gift made by a donor in contemplation of the conceived approach of death, that the title is *not* complete till he is actually dead." (*Duffield* v. *Elwes*, 1 *Blighs, N. S.* (*H. Lords*), 1827, p. 497, by Eldon. *Farquharson* v. *Cave.*, 2 *Collyer*, p. 356.)

And further, "To constitute a valid *donatio mortis causâ*, there must be a delivery, an *absolute* and *unconditional* delivery, of possession to donee, and the possession of donee *must continue until the death.*"

"That it is ambulatory, incomplete, and revocable during the testator's life. This revocation may be effected either by the donor's recovery or by resumption of the possession. That it may be satisfied by a legacy given to the donee.

"*That it is in the nature of a legacy.*" (1 *Roper on Legacies*, *pp.* 2, 3, 6, 8, 20, 23. 1 *Williams' Executors, ed.* 1832, *marg. p.* 499, and affirmed in *Harris* v. *Clark*, 3 *Comstock*, 93. 2 *Kent's Comm.* 447, *marg. p.* 1 *Story, Eq. Jur.*, § 607.)

(*a*) It is in evidence that these bonds were in the possession of the testator and in the box containing all his securities and assets, *at the time of his death;* and were *never removed therefrom until* the morning *after* his death, when this claimant took *them out* into his possession for the first time; and they were included by the testator in the last

schedule of his property, made by himself shortly before his death.

(*b*) It is also in evidence, that just after and about the date of the execution of the will, 16th December, 1851, more than *three weeks before his death*, the testator on being shown these three bonds by his wife, who then held them in her hand, and being asked by her "whether she should hand over to each of the children one of the $1,000 bonds, now that the will gives to the three children alike?" answered, "No; put them *back* in *my* tin box," which was the depository of the rest of his assets, and whence she had taken them.

And further, That the *day before his death* the testator, to be assured that his wife had complied with his directions to *replace* these bonds, and that they were still in his possession, *and that he should die* in their possession, called his daughter, Mary Eliza, to his bedside, told her "to get his tin box and bring it to him, to open it, and see if these bonds were in there; that she brought and opened the tin box, and *showed him these bonds then in it;* that testator then said 'all right,' and told her to *put the bonds back into the tin box, to lock the box, and keep the key till after his death,* and then deliver it to Richard A. Reading, his executor." She did so lock the box and keep the key, until at her mother's request, after the death, she gave it to William H. Merchant, claimant, who thereby alone, and *for the first time,* obtained possession.

It is further proved, that after the gift was made testator executed his last will, which divided his estate *equally* among his *three children,* giving to *his son* an *equal share* with the others; and that upon and at the time of its execution he expressed himself in the strongest manner to the witnesses Reading and Hewitt: "That I can now die with more satisfaction, for my son has an equal share of my estate." And in his instructions to Reading to draw the last will, "He stated that there was a will in existence

which materially cut the son short from an equal share with the rest of the family, and he wanted him to draw another will making them all equal."

From this evidence, which is undisputed, it follows plainly.

1st. That this *donatio mortis causâ* of these bonds was revoked in the clearest manner.

(*a*) By resumption of the possession thereof by testator three weeks before his death, in presence of his wife, and

(*b*) By resumption of possession the day before his death in presence of his daughter.

(*c*) That he died in full possession; and this claimant never had any possession at all of these bonds until the morning after his death.

(*d*) That the testator never intended to make him any such gift, for he executed the last will and directed it to be prepared, with the sole object of *dividing all* his property *equally* among *his three* children, and the will which is now on record so divides all his property; and upon its execution on the 16th December, 1851, which is after the presumed date of the alleged gift, he expressed himself that he should " die now with satisfaction, as he had made his son equal with the rest."

The legacy of one-fourth of his entire large estate equally with the rest of his family, was a satisfaction of any claim of this son, and was so intended by the testator, by all his previous and subsequent acts. (*Jones* v. *Selby, Finch's Prec. Ch.*, 300, reported in *Roper on Legacies*, p. 14.)

This loose story of a gift at all, is *directly opposed to all the testator's declarations and acts*, and is therefore IMPOSSIBLE. (*Farquharson* v. *Cave, ut supra.*) " All the acts of testator are consistent, and show his understanding that the bonds would be in his own custody or under his own control at his death, and be delivered at his death to his executor. There could be no gift of any kind."

This evidence makes this case like that of *Bunn* v. *Markham*, 7 *Taunton*, 224, reported in *Roper, Legacies,* p. 6. (*Farquharson* v. *Cave*, 2 *Collyer, p.* 356, *Walter* v. *Hodge*, 2 *Swanston* 106, *Walsh* v. *Studdart*, 4 *Drury & Warren*, 171.)

4. This is, then, a case of willful and fraudulent conversion of the assets of testator by the executor, after the death, to his own use.

It is a case of devastavit for which this executor is personally liable; and there should be a decree against him personally, in favor of the distributees, for the amount in value of these bonds, with interest from the date of the decease. (*Thorp* v. *Amos*, 1 *Sand. Ch.*, 26, 32; 2 *R. S., p.* 72, § 17. *Ibid. p.* 449, § 17. *Dayton, p.* 216, and *seq.*)

THE SURROGATE. On the final accounting of the executor William H. Merchant, the legatees seek to charge him with three thousand dollars, the amount of three Erie Railroad income bonds, which they allege were the property of the deceased.

To prove this, the claimants produced the inventory; but, the entry thereon showing that the executor claimed the bonds as a gift from the testator, the proof was insufficient. Mr. Dodge then testified that the executor, after the testator's death, called at his office and stated that he had taken the bonds in question out of the box containing the securities of the estate, on the morning after the decease of his father—the executor alleging as a reason, that he claimed them as his own, as a gift from his parent.

It was then proved on the part of the executor, by the evidence of his co-executor, Mr. Reading, that two of the legatees had stated that the testator gave to his son, William, the bonds in question, some short time previous to the

making of his last will—within a month before; that it was a full and free gift, and William had handed the bonds to his mother; that subsequently and after the testator made his last will, his wife took the bonds, conversed with him about the will as it then stood, and, holding the bonds in her hand, said, " Now, that the will gives each child alike, shall I hand over to each child a thousand-dollar bond?" The testator said, " No, put them back in my tin box." It also appears that, the day before the testator's death, he directed one of his daughters to bring the box, open it, and see if the bonds were there. She opened it and shewed him the bonds; and he said it was all right, and told her to put them back in the box, keep the key, and at his decease deliver it to Mr. Reading, one of his executors—that she kept the key till after her father's death, when she gave the key, at her mother's request, to her brother William, the other executor.

It *is* certain that the bonds in question once belonged to the testator, and they were entered by him on a schedule of his assets. The testator having made a will by which his son had not been placed on an equal footing with his daughters, and having subsequently become reconciled to his son, made the gift of these bonds, when his will remained in that condition. He afterwards revoked that will and executed another, in which his children were treated alike, except that the daughters were given the use of his dwelling-house and furniture in common with their mother. After the new will had been made, Mrs. Merchant brought the bonds to the testator, and the conversations and circumstances occurred which I have before stated.

1. Was the gift to the son a donation *inter vivos* or *mortis causâ?* It is proved, that the testator was at the time in his last sickness, and that during the whole course of his illness, he did not expect to recover. In such a case, the presumption of law is that the gift was intended as a *donatio mortis causâ.* (1. *Roper on Leg.*, 22.)

2. It having been shown, that after the gift the testator resumed possession, it is urged on one side, that the gift was revoked; and on the other, that possession having been obtained by the donor without the consent or privity of the donee, the gift was not legally revoked. The last point involves the proposition that the donor cannot revoke the gift without the consent of the donee.

I would remark, in the first place, that if this be so, it is a solitary exception to dispositions of property made in view of death, by the voluntary bounty of the donor.

It is true that a will does not revoke a *donatio mortis causâ;* but the reason is that the will does not speak till the testator's death—till the very moment the donation by its terms has become absolute—when of course it is too late to revoke it. On the donor's death, the donee's title becomes absolute, and therefore irrevocable by a will, which from its nature is inoperative during the donor's life time, the only period during which the donation could be revoked.

It is insisted, however, that, inasmuch as the entire dominion of the donor over the property is transferred to the donee, no right of revocation exists. But this rule, as I understand it, does not mean that the donor reserves no right of revocation—but only that he parts with the control and possession of the property ( *Williams on Ex.*, 654)— that there is not a partial but absolute delivery and change of possession. If such an absolute delivery is inconsistent with a power of revocation by simple reclamation, it is just as inconsistent with a revocation in case of the donor's re_covery. Such an argument would destroy the peculiar character of this class of donations, and transform them into pure irrevocable gifts *inter vivos.*

The truth is, that the whole of this doctrine of revocation is a rule of law. The law declares that a donation *mortis causâ,* is revocable in case the donor recover—and that, too, notwithstanding the gift was in express terms absolute, and the delivery was absolute. I do not see in any case

that the power of revocation is inconsistent with absolute dominion in the donee, existing under a condition annexed by the law to the gift, that the donor may resume the property. An attorney in fact, for the time being has full authority and absolute dominion within the scope of his power; and yet the power may be revoked at any instant. In the sense contended for by the counsel of the executor, a donee has not absolute dominion over the subject of the gift: though his possession for the time is absolute, his title does not become perfect till the donor's death. Before that period, he cannot dispose of the property. If that event should not happen, the donor may resume his gift.

It is conceded on all hands, that if the donor recover the gift will be defeated. This is a condition the law implies; and if the law likewise implies that the gift may be reclaimed at the pleasure of the donor—the latter condition is no more incongruous with the possession and dominion of the donee than the former.

It is admitted that the gift may be revoked in the donor's lifetime, by resumption of possession; but if that means, that the subject of the gift must come back into the possession of the donor by the consent of the donee, it amounts only to the simple truism, that both parties can by mutual agreement annul the transaction. But if by resumption of possession, a reclamation of possession is intended, then the gift can be revoked at the option of the donor. This seems to be the view taken in *Bunn* vs. *Markham*, 7 *Taunton*, 224, where Gibbs, C. J., says, "It is in the power of the donor at any time to revoke the donation before his death." In *Ward* vs. *Turner*, 2 *Vesey*, *sen.*, 433, Lord Hardwicke does not declare that an actual resumption of possession is necessary to constitute a valid revocation; but on the contrary he cites the Commentary of Vinius to the effect, that the donor where the gift was defeated by "recovery or *revocation*," had his action against the donee. (*Ibid.*, *p.* 439.)

Suppose the donee dies before the donor, does the gift

stand ?. In the case of a will, the prior decease of the legatee causes the legacy to lapse. This was the rule of the civil law in respect to donations *mortis causâ ;* and in the same breath this was declared, the power of the donor to revoke was likewise expressed. The terms or conditions on which the donor can recover the subject of the gift are thus stated in the Institutes : *Sin autem supervixisset is qui donavit, reciperet ; vel si eum donationis pœnituisset, aut prior decesserit is cui donatum sit.* (*Inst., lib.* 2, *tit.* 7, § 1.) Again, in the Digest, it is laid down, *Mortis causâ donatio, etiam dum pendet an convalescere possit donator,* revocari potest. (*Digest, l.* 39, *tit.* 6, § 16, *item* § 30.)

The three conditions annexed to the gift by the civil law, which on happening defeat the donation, are: 1st, The recovery of the donor ; 2d, His repentance of the gift ; 3d, The death of the donee before the donor's decease. These are separate and independent conditions. Ayliffe says, The gift " may be revoked by the donor's repenting thereof. (*Parergon,* 331. *Bracton, lib.* 2, *cap.* 26, § 1.) In *Jones* vs. *Selby, Prec. Ch.,* 300, the Chancellor said, " You agree that a *donatio causâ mortis* is a gift *in presenti,* to take effect *in futuro* after the party's death, as a will ; and that it *is revocable during his life,* as a will is." Chancellor Kent speaks of these gifts as " conditional *and revocable* and of a testamentary character." (2 *Com.,* 445.) In *Wells* vs. *Tucker,* 3 *Binney,* 370, Justice Tilghman says, " it is contended on the part of the plaintiff, that a gift of this kind passes the property *immediately,* and is not subject to revocation by the donor. Without absolutely committing myself, I incline to the opinion, that in this as in several other particulars, it partakes of the nature of a legacy, and is revocable." In the same case, Justice Yeates describes the donation as " subject to countermand and revocation." In *Nicholas* vs. *Adams,* 2 *Wharton,* 22, Justice Gibson states accurately the three modes of defeasance acknowledged by the civil law. His language is, that it is " de-

feasible by reclamation—the contingency of survivorship—or deliverance from the peril."

I find nothing against this doctrine—unless it be the language of the Vice Chancellor, in *Reddel* vs. *Dobree*, 10 *Simons*, 244, who, speaking of an alleged donation, characterized it as a gift which "was always liable during the lifetime of the testator to be recalled by him;" and "therefore the very essence of a *donatio mortis causâ*," was wanting. The gift in that case, was of money that might happen to be in a certain box at the testator's death, and on condition that up to the time of his death, he should retain "the complete dominion over whatever might be placed in the box." The opinion of the Vice Chancellor is, substantially, that the reservation of this dominion is inconsistent with the essence of a *donatio mortis causâ*. If no more than that was intended, the doctrine is but another form of stating that there must be a complete delivery. If it was designed to declare that when there had been a complete delivery, the donor could not revoke the gift, such an opinion was not called for by the case in hand, and is not agreeable with the authorities. There are several cases besides that of *Reddel* vs. *Dobree*, which might be supposed to imply that the donor had no right to revoke (4 *Dru. & W.*, 159, 285; 2 *Coll.* 356; 8 *Mee. & W.*, 401); but I think they proceed on the ground that there must be an absolute delivery, a change of possession and dominion, so as to vest the full possessory title in the donee, subject only to such rules as the law applies to this class of gifts. That a *donatio mortis causâ* cannot be revoked at the will of the donor, I find no where decided, or distinctly asserted; while the rule of the civil law, that it could be revoked if the donor repented, even while it was uncertain whether or not he would recover, is clearly laid down in the Digest, and has been admitted to be the rule at common law, by a number of distinguished

judges, although I am not aware the point has expressly arisen as the subject of distinct decision.

Applying this rule to the facts in evidence, I am of opinion that the testator conceived this gift to be revoked. After making the donation, he made a change in his will, and substantial alterations as to the disposition of his property, in favor of the donee. When that act was accomplished, his wife brought these bonds to him, and asked whether she should distribute them among his children. He said, " No," and directed them to be placed in the depository where he kept his valuable papers. That direction was not only a resumption of the possession, but an indication of a change in his views in respect to the disposition of the property. His subsequent conduct, in calling for the box, inquiring whether the bonds were there, and directing his daughter to lock the box, and give the key not to his son, but to the other executor, after his death, confirms the idea of revocation, and shows he intended the bonds to come into the possession of his executor, after his decease, as a part of his estate. I think, therefore, that the revocation has been sustained.

The jurisdiction of the Surrogate to try this question, has been questioned by the counsel of the donee. The Surrogate has jurisdiction to try every question necessary to the settlement of the accounts of the executor. It is competent for the legatees, on the accounting of the executor, to produce evidence to charge him with more assets than he acknowledges in his accounts to have received. They may prove the testator had assets which the executor should have collected, or which he has received and not brought into his accounts. In the present case, the legatees assumed the last position. They sought to charge the executor with the amount of these bonds, and shewed the bonds had belonged to the testator in his life-time, and that the executor had admitted they were in the possession of the testator at the time of his death., Had the case stopped

there, it would have been my duty to have charged the executor with the amount of the bonds. But he sets up a gift by the testator; and in order to decide whether he is liable or not for the bonds, the question of gift must be determined. The executor himself raised this point, to exonerate himself from liability; and it is necessary to decide it in order to settle his accounts, and make a final decree for the distribution of the estate. If an executor can retain assets on the plea of a gift *causâ mortis,* and then successfully impeach the Surrogate's jurisdiction to inquire into the validity of this plea, the power of this court in respect to the settlement of accounts and the adjustment of estates is at an end.

I am very clear that this objection is not tenable—and must therefore decree distribution, in accordance with the conclusion to which I have arrived, respecting the revocation of the donation by the testator before his decease.