NEW YORK COUNTY.—HON. D. C. CALVIN, SURROGATE.—JUNE, 1876.

## STEVENS *v.* STEVENS.

*In the matter of the Estate of* PARAN STEVENS, *deceased.*

To constitute a gift *inter vivos* there must be an expression of intention to make a gift, and an actual delivery to the donee.*

The testator, while living, subscribed to shares in an Opera House corporation, and took the certificates in his own name; but the ticket issued to him for the box represented by his shares, he delivered to his wife. He said he purchased the box for her, and that she needed no other evidence of ownership than the tickets. She enjoyed the use of the box, and he allowed her to rent it and receive the rent for her own use. *Held,* that this did not establish a gift of the shares to her; that she occupied by his license, and for occupancy after his death, his executors might charge her rent. †

A husband whose wife was going abroad with their daughter provided her with circular notes in the nature of a commercial or traveler's credit for their expenses and purchases. He died while they were abroad. *Held,* that so much of the credit as was used for expenditures while abroad, and returning on hearing of his death, could not be charged to her by the executors, but she was chargeable with notes collected by her bankers after her return.

Where real property of the decedent was set apart to the trustees of a legatee in fulfillment of a gift in the will, under an agreement that the legatee was to be responsible for repairs after a specified date, *Held* that repairs made after that date, though ordered before it, were chargeable to the legatee.

A large house constructed and recently furnished for letting in apartments was set apart to a legatee as a part of the gift intended by the will, under an agreement that she should take the furniture "at a valuation." *Held,* under the circumstances, that the valuation should be as for the purpose of letting in the apartments, not for the purpose of removing and selling as second-hand furniture.

The agreement for such transfer provided that the legatee should receive the rents from a specified date. *Held,* that the legatee was entitled to be reimbursed by the estate a sum which she had to deduct from the rent collectable, by reason of a breach of the decedent's covenant, as to the condition of the premises in the lease he had given to a tenant.

---

*As to extrinsic evidence of intent, see *Philips* v. *McCombs* (53 *N. Y.*, 494,
† For a case of gift of stock or interest certificates, see *Brundage* v. *Brundage* (60 N. Y., 554.) See also *Matter of Ward, ante, p.* 251.

STEVENS *v.* STEVENS.

Where executors paid bills for repairs and household expenses dated after the testator's death, *Held,* upon the testimony of the widow that they were in fact incurred before his death, that they could not charge them to the widow.

Expenditures for insurances of property in which the widow had only a life estate, made by the executors, without her authority, and largely for the benefit of the ultimate estate,—*Held,* not chargeable by the executors to her.

The testator, after making provision for a married daughter, directed that in case there should be other children of his living at his death, a specified sum which he had advanced to the married daughter be deducted, with interest, and with any other moneys which he might advance after a specified date, adding in parenthesis (also the further sum of $86,000.) He made the husband of the daughter an executor. It appeared that the testator had informed the draftsman of his will that the $86,000, represented claims which the testator held against the son-in-law.

*Held* 1. That parol evidence of that statement was admissible to enable the court to construe the clause.

2. That although there was no direct gift to the executor, there was sufficient indication of testator's intent that the claim against him, if enforced at all, should be enforced by deducting it from his wife's bequest, so as to exonerate the executor in omitting the claim from the inventory, and from being charged therefor as for an asset.

The rule that the Surrogate cannot determine disputed claims on an accounting, does not preclude him from determining a controversy as to whether a claim against an executor is discharged by the will.

THIS was a proceeding on the final accounting by the executors of the will of Paran Stevens, deceased.

The account was filed by John L. Melcher and C. G. Stevens, two of the executors, on the 4th June, 1874, to which Marietta R. Stevens, executrix, filed objections, September 4, 1874, stating that the account was filed without her being joined, and insisting on her right to join in such accounting, so that she might be discharged as such executrix.

Among the objections thus filed by Marietta R. Stevens, were the following :—

To the sum of $11,390.69, in schedule under date August 10th, 1872, Duncan, Sherman & Co.; use of opera box in the Academy of Music, $1,125; furniture in Apartment House, $10,967.88.

That the accounting in one of the schedules (B), should include J. L. Melcher's note for $20,000, and the sum of $51,347.87 due from said Melcher to said estate, on an instrument bearing date September 5th, 1868, with interest.

That schedule B improperly contained four shares of the New York Academy of Music stock, which was her individual property.

That in another schedule (C) the sum of $200, paid Kingsland subscription for the Academy of Music shares, should be charged to her individually.

That there should be charged to said estate, and credited to her, $450, for traveling expenses as executrix; $500, rent of office in the Apartment House, and sundry bills for work on the same.

The items first referred to above, and not specified, consisted of certain bills paid by the estate, and charged to Mrs. Stevens, for purchases made in Europe, apparently in June and July, 1872, for work supplies, and help, upon the apartment house, and upon the house in Newport.

Subsequently, on the 16th day of October, 1874, an order was made, on application of Mrs. Stevens, that she join in the accounting as executrix, and that the account filed by the executors, with charges to correspond with the exceptions filed by Mrs. Stevens, be taken as hers, as such executrix, as though filed by her.

Objections to the account so filed by Mrs. Stevens, executrix, were filed ·by the executors as such, and trustees, and by said Melcher, Ellen S. Melcher and J. L. Melcher, purporting to bear date September 23rd 1874, but doubtless intended to apply to the account, deemed filed, under the order of October, whereby they objected substantially to the items covered by the objections of Mrs. Stevens, and which were by the Surro-

gate deemed as incorporated into, and forming part of, the account, and deemed filed by her.

On April 14th, 1875, there seem to have been additional exceptions interposed by Mrs. Stevens in respect to certain insurances charged to her in schedule E, but as to which there appears to have been no evidence given in the case.

On these objections, the matter was referred to the late Surrogate Van Schaick, as auditor; and about two thirds of the testimony was taken before him as such auditor; and after he had assumed the duties of Surrogate, the residue of the testimony was taken before him, but the case was not determined before his death.

What purported to be a copy of said auditor's report without signature, is presented to me, apparently determining all the questions raised by the objections in favour of Mrs. Stevens, but there was nothing appearing among the papers to explain the occasion of filing such report, before the testimony was closed; but counsel advised that it was done *pro forma* to enable the parties to make use of the testimony already taken before the auditor, on continuance of the hearing before him, as Surrogate.

Under these circumstances, the matter was submitted and determined as though no such report had been made.

It appeared from the testimony that the testator died April 25th, 1872, at his residence in this city, leaving his widow Mrs. Marietta R. Stevens, and two children by her, a daughter Miss Mary Fiske Stevens, now of full age, and a son Henry Leiden Stevens, now about 18 years old, also a daughter by an earlier marriage, Ellen, wife of J. L. Melcher.

By his will dated July 10th, 1869, the testator among other provisions left to his wife a legacy of $100,000, also in trust for her benefit, one million dollars.

By a codicil dated April 21st, 1872, he left to his son in addition to the provisions in his will, $300,000, payable upon the son arriving at the age of 30 years; the residue of his estate, including the trust to Mrs. Stevens, after her death, he directed to be divided into three shares, one of which was left in trust for the benefit of each of his three children.

The facts material to the specific questions passed by the Surrogate were as follows:

1. It appeared by the testimony that Mr. Stevens subscribed for four shares, each of $1,000, of stock in the Academy of Music and took the certificates in his name; that the certificates entitled the owner to four seats in a box; that the box allotted to Mr. Stevens was called "the Grisi box," and that tickets were issued to the owner of the box, the possession of which gave the right to its occupancy, under the regulations of the corporation; that Mr. Stevens said, when he purchased the box in question, that it was for his wife; that he told her that he had purchased the box for her; she asked him what evidence she had to show that it was hers; he delivered the tickets to her and said to her that it was not necessary that she should have any evidence of ownership; that it was hers in fact. It appeared that she occupied it with other members of the family; she at one time rented the box, and received the rent herself, with the knowledge and approbation of her husband. It appeared however that the certificates of stock were never transferred to her, but retained by Mr. Stevens; that in order to transfer the shares of stock under the regulations of the Academy, it was necessary to surrender the certificate, and take new ones, in the name of the purchaser.

It also appeared that Mr. Stevens, in his life-time, included the opera box in his inventory of his estate, which he was in the habit of making annually; that

Mrs. Stevens after his death had occupied the box, and that the rent amounted to $1,125, which by the executors was charged to her; that she, after Mr. Steven's death, paid $200 for an assessment on said box and, as executrix, charged the same to the estate.

2. The next question in dispute related to a charge made against Mrs. Stevens of $11,390.69, the proceeds of circulating notes of credit issued by Duncan, Sherman & Co. for £2,000 sterling under the following circumstances. In March, 1872, Mrs. Stevens and her daughter were about to leave for Europe. Just previous to her departure, Mr. Stevens procured from Duncan, Sherman & Co. circulating notes, to the amount of £2,000, and delivered them to Mrs. Stevens for the purpose of paying her expenses, and for her use, together with the expenses of the daughter. Mr. Stevens gave his note for £1,300, Mrs. Stevens desiring to take but that amount at first, but Mr. Stevens urged her to take £2,000. By inadvertence he did not execute the note for the balance of £700—the terms of the note being substantially that Mr. Stevens would pay the sum mentioned, or so much thereof as should be used of such circulating notes, with the interest, exchange, &c., which notes were payable at the Union Bank, London.

Mrs. Stevens went to Europe with her daughter, and had arrived but four or five days in Paris, when she received intelligence of the death of Mr. Stevens. In the meantime, she had used about £200 of said notes in payment for purchases made by her, including the money used by her, in paying the expenses of herself, and daughter. On her return, she made some purchases by way of mourning apparel, after receiving the intelligence of her husband's death, and before her departure for home, leaving eighteen hundred pounds, equal to

$10,241.54, which notes she retained until some time in the summer after her return to New York; when, on consultation with Mr. Sherman, she negotiated them and received the proceeds.

Mrs. Stevens claims that the £2,000 was a gift to her, and that no part of that sum should be charged to her, by the executors.

3. The next items objected to by Mrs. Stevens were: June 12, 1872, J. Monroe & Co., $1,408.68; July 1, Henry Clews & Co., $62.20; September 20th, J. Monroe & Co., $1,316.79, charged to her,—being for personal expenses, incurred after Mr. Stevens' death,—the executors having charged her with all bills paid, which bore date subsequent to the death of Mr. Stevens. Most of these accounts, Mrs. Stevens testified, were incurred prior to Mr. Stevens' death; some small portion however incurred after his death, together with small sums for mourning, &c.

4. The next items objected to by Mrs. Stevens were for certain repairs made upon the apartment house (so called) which was transferred to Mrs. Stevens under an agreement bearing date October 28, 1873, by which the " apartment house" was transferred, at a valuation, to trustees of Mrs. Stevens, on account of the one million trust legacy, the agreement providing that the transfer should be made, as of the 1st of May, 1873, she to be allowed for rent from that date, and to be responsible for repairs after April 26, 1873, providing also that she would allow at cost for the furniture in said house ordered after April, 1873, and for that previously ordered at a valuation. The repairs objected to were actually made after the 26th day of April, 1873, but a portion of them had been ordered, or contracted for before that period.

5. The next objection related to the furniture of the

apartment house. It appeared that Messrs. Colton and Taylor appraised the furniture in the apartment house, purchased prior to 1st of April, at $7,348.56, being 10 per cent. discount on the bills as purchased—the furniture having been purchased between December, 1872, and April 1st, 1873—and appraised that purchased after April 1st, at $2,802.80, aggregating $10,151.38. It appeared that this appraisal was made on the invitation of the executors, but it was claimed to have been made without the knowledge of Mrs. Stevens; it appearing also that one Colton, a large dealer in second-hand furniture, on the invitation of Mrs. Stevens, estimated the furniture, appraising it at $4,550.80, second-hand furniture, valuing it at what it would bring taken out of the premises, and sold. Mr. Taylor was a large furniture dealer, and had sold most of the furniture to the estate. Mr. Cranston, the other appraiser, had made the purchases, and received the furniture into his house.

The executors claimed that as the agreement between the parties provided for Mrs. Stevens taking the furniture at a valuation, with the house, it was proper to estimate its value as a part of the estate in reference to its use in the house; while Mrs. Stevens claims that the estimate should be made independent of the fact that she was to have the house; that it was to be sold as for a second-hand sale in the market.

6. The next objection related to the charge made by Mrs. Stevens against the estate of $500 for the use of an office in the apartment house by the executors from May 1st to November 1st, 1873.

It appeared that the executor had used the same office prior to the date mentioned, and they continued to occupy it until November 1. But it was alleged by the executors that it was also occupied for the business of the apartment house, and that the charge was too high.

7. The next objection was to the charge made by Mrs. Stevens as executrix of $450 for traveling expenses &c., she testifying that such expenses were incurred necessarily in visits to attend to the business of the estate —particularly as to the property situated in Boston.

8. Mrs. Stevens also claimed to charge the estate with the sum of $1,925, and allowed by her to J. B. Brewster & Co. for damages done to their carriages, they occupying a portion of the apartment house, and the damage occurring on the 17th of October, 1873, said Brewster being in, under a lease made with the estate prior to April 1st, 1873. Mrs. Stevens, as she testified, had been compelled to allow that amount of damage when she settled with Messrs. Brewster & Co. for the rent—subsequently to her taking the premises under the agreement of date October 27, 1873. On the other hand, the executors claimed that Mrs. Stevens, under that agreement, became the equitable assignee of the lease and liable as sub-tenant for any damage which occurred as after 1st of May, 1873, to which time, her possession and right related.

9. The next objection was as to a number of items charged to Mrs. Stevens individually by the executors under dates of June 25, 1872, July 30th, Sept. 18th, October 11th, December 14th, in the same year, being for supplies, repairs, &c., furnished, and made upon the house occupied as a residence by the deceased, and the house and premises at New York given to Mrs. Stevens by the will, and for the care of her houses; some of which bills and charges, however, were increased between the period of Mr. Stevens' death, and Mrs. Stevens' return to New-York, and were all charged to her, because incurred subsequent to Mr. Stevens' death, though Mrs. Stevens testified that some of the repairs on the Newport house were incurred prior to Mr. Stevens' death. The charge,

September 18th, sundry bills, $698.13, appeared to have been for household expenses of Mrs. Stevens, and for servants' wages paid and incurred, after Mr. Stevens' death, including a charge for livery of coachman, and groom, and the wages of the coachman, cooks, butler, groom &c. It also appeared by the testimony of Mr. Melcher that all the bills, and servants' wages to the death of Mr. Stevens were paid by him, and charged in his account.

10. The next series of charges discussed by the respective counsel, consisted of several items of insurance from June 13th, 1872, to December 6th, 1873, upon the Fifth Avenue and Newport property. There was no evidence that Mrs. Stevens had any personal knowledge of these insurances, but they appeared to have been upon the property in which Mrs. Stevens had only a life interest; but to these items there seems to have been no objections filed

12. The next and final question raised, by the objections filed by Mrs. Stevens, related to the alleged omission to state in schedule B, a note of J. L. Melcher for $20,000, and to an alleged indebtedness of his to the estate of $51,347.87, with interest on both.

In relation to these charges the testimony showed substantially that while Mr. Stevens was absent in Europe in 1867–68, Mr. Melcher, a son-in-law of Mr. Stevens, was left in charge of certain Pacific Mail stock owned by Mr. Stevens, with instructions to sell the same; that Mr. Melcher did sell and deal in said stock and deposited the proceeds with Messrs. Temple & Marsh, brokers in Wall street, and that subsequently, and prior to Mr. Stevens' return, Temple & Marsh failed, and there was a loss of the sum of $51,347.87, for which Mr. Melcher, on Mr. Stevens' return, on the 5th day of September, 1868, assigned to Mr. Stevens the monthly divi-

dends which should be earned on said Melcher's share of the profits of the business of Darling, Griswell & Co., or their successors, from the 1st day of August, 1877, until the sum above mentioned should be realized by said Stevens, with interest, being an interest owned by said Melcher in the Fifth Avenue Hotel receipts, &c. The testimony also showed that on Mr. Stevens' return, Mr. Melcher had an outstanding note or obligation, which it was important for him to meet, and which he could not meet without the aid of Mr. Stevens to the amount of $20,000—that Mr. Stevens advanced that sum to Mr. Melcher, and took his note for the amount.

Mr. Melcher's interest in the Fifth Avenue Hotel profits it appeared was the gift by Mr. Stevens to Mr. Melcher—Mr. Melcher executing an instrument by which he undertook to pay out of the earnings thereof $22,689.59. It also appeared that, in December, 1871, Mr. Melcher, by a letter addressed to Mr. Stevens, recognized his obligation, but that there never was any demand made upon him for payment.

It appeared that Mr. Stevens, in his life-time, was in the habit of making an inventory of his effects on the 1st day of January of each year—that he included in it the advances made to his children, with interest, and embraced also his wife's jewels.

By his inventory of January 1st, 1871, he entered "paid Ellen M. Melcher," and charged in account $59,975.31, with interest thereon, $8,396.56 (" also additional $86,000").

In his inventory of January 1st, 1872, the following entry appeared: "paid Ellen M. Melcher's charge on account and interest to date, harness bill and all $80,-187.86—also additional amount lost by *M.* and interest $92,000."

By the last will and testament of Mr. Stevens bearing

date July 10th, 1869, in the eleventh clause thereof, he provided, that if there should be any other children, descendants of his, living at the decease of his wife, other than his daughter Ellen (Mrs. Melcher) and her issue, there should be deducted from the share of said Ellen, in the principal of said trust fund (of one million) created for the benefit of his wife, added to the shares of the others therein, the sum of $59,975.31, which included all the moneys he had paid and advanced to her, with interest up to the 1st day of January, 1869, to draw interest annually, until his decease, and also any other sum, or sums that he should or may have advanced after the 1st day of May, 1869, and charged to her account (also the further sum of $86,000).

The evidence also showed that Mr. Arnold, who drew the will, was informed by Mr. Stevens that the clause respecting the $86,000 represented, and was intended to cover the $20,000 and the $51,347.87 lost by Mr. Melcher in the Pacific Mail transaction with Temple & Marsh.

JOHN E. BURRILL and J. V. B. ARNOLD, *for the Executors.*

JOHN E. PARSONS, *for the Executrix, in opposition.*

THE SURROGATE.—In passing upon the question raised by the objections to the account in this matter I shall consider them *seriatem.*

1. As to the ownership of the opera box, the question is whether the facts proved constitute a gift to Mrs. Stevens *inter vivos.*

The counsel for Mrs. Stevens cited several authorities upon his brief showing that a chose in action may be assigned by parol, to sustain the claim of Mrs. Stevens to the opera box in question; but in each of the cases referred to, as I understand them, there was an actual delivery of the evidence of the indebtedness, and

it seems to me, that if Mrs. Stevens is entitled to hold the opera box in question, as her property, it must be because of the gift by her husband *inter vivos.* To constitute such a gift, there must be an expression of intention to make a gift, and actual delivery of the subject thereof to the donee. (*Bedell* v. *Carll, 33 N. Y.,* 581; *Shuttleworth* v. *Winter,* 55 *Id.,* 624; *Irish* v. *Nutting,* 47 *Barb.,* 370.)

In the last case cited, Judge BACON (at page 388) says: "An absolute gift divests the donor's title, and requires a renunciation on his part, and the acquisition on the part of the donee, of all title to, and interest in, the subject of the gift." The evidence in this case shows that the title to the box in question consisted of four certificates taken, and remaining in the name of Mr. Stevens, and that the tickets were the only evidence of the right to occupy, which were delivered to Mrs. Stevens. The expression of an intention to give the box to Mrs. Stevens did not consummate the gift, but it was necessary either to deliver the subject of the gift, or some evidence of title. It is quite evident that if Mrs. Stevens, on the faith of the four tickets and the allegation of ownership, had transferred the box in question to a third party, Mr. Stevens might have taken proceedings to eject the purchaser and to resume his authority over it. It seems to me equally clear that Mr. Stevens in stating that the box was his wife's, in view of his retention of the evidence of the title, did not show any intention to be divested of his title to, or control over it.

I do not attach much significance to the fact that Mr. Stevens inventoried the box, as his property, because he was in the habit of including in his inventory money which had been advanced to his children, and his wife's jewels; nor do I think that Mr. Stevens' payment of the

assessment upon the box, and charging it to the estate, affects the question of title, as that question must be determined upon well settled principles of law, nor is the fact in my opinion at all controlling that the executors and executrix included the box in the inventory

It is not my province to determine as to the propriety of the claim made by the executors, either as to the ownership of the box, or the charge to Mrs. Stevens of the rental. These are questions of propriety which address themselves with more or less effect to the parties interested in the controversy.

The transaction, as it seems to me, lacks the essential ingredients of a gift *inter vivos*; and therefore I must hold that the *Box* is the property of the estate, and properly inserted in the account; and that being so, Mrs. Stevens only had a license to occupy by permission of the testator and the authority of the tickets, which ceased on testator's death; and that Mrs. Stevens is chargeable with the use of it from that period.

2. The question of Mrs. Stevens' liability for the balance of the sum furnished to her by Mr. Stevens, is one, it seems to me, depending on the intention of Mr. Stevens at the time the advance was made, and to be derived from all the circumstances of the case.

It is quite clear that so far as Mr. Stevens' liability to Messrs. Duncan, Sherman & Company is concerned, it is dependant upon the amount of the circulating notes actually used ; yet it is equally clear that that liability could be fixed by the use of the notes, whether in accordance with, or in violation of, the intention of Mr. Stevens, respecting their use, and that the subsequent collection of the amount after his death, by Mrs. Stevens, as between the estate, and Messrs. Duncan, Sherman & Co., made the estate liable for the full amount. But the terms of the note given by Mr. Stevens, and the

liability which subsequently attached, do not throw much light upon the intention of the parties as between themselves.

The fact that these circulating notes were procured by Mr. Stevens, and delivered to his wife, for the purpose of defraying the traveling and personal expenses of Mrs. Stevens and her daughter in Europe, and for the purpose of investing in household furniture and ornaments, indicates to any mind no intention on the part of Mr. Stevens to give up all control over that amount of money, in the event that it should not be used for the purposes contemplated. Some portion of it was to be devoted to the expenses of his daughter, and it cannot be supposed that he intended to part with all interest in it, and leave Mrs. Stevens at liberty to decline to defray the expenses of her daughter, or to raise other moneys on his credit to pay the expenses of such journey; nor can it be doubted that if Mrs. Stevens should have used the money in question in purchasing articles of household furniture, such furniture would have been the property of Mr. Stevens.

Suppose that Mrs. Stevens by some accident failed to go to Europe altogether, I think it cannot be reasonably pretended that she could still, as against her husband, claim to be a donee of these circulating notes. The circumstances of the case do not show an intention on the part of Mr. Stevens to part with all right to or authority over the money. It was delivered for the purpose of being used to defray expenses, &c., for which Mr. Stevens himself was properly chargeable, and its delivery for that purpose, to my mind, evinces no determination to divest himself of all control or authority over it; and if Mrs. Stevens had died possessed of any of these notes, or their proceeds, there would have been no necessity for instituting proceedings in respect to

them as belonging to her estate, but they might have been taken by Mr. Stevens as his property.

That portion of the notes used by Mrs. Stevens according to the purpose of their delivery, while abroad, and on her return, cannot be reasonably claimed by the estate, but the £1,800—not used until July 11th, 1872, and then collected by her, equal to $10,241.54—it seems to me, belongs to the estate, and should be charged to Mrs. Stevens in the account.

3. From the testimony, I think that the accounts— J. Monroe & Co., $1,408.68, $1,316.79, H. Clews & Co. $62.20—are proper charges against the estate, and are not chargeable to Mrs. Stevens individually, although the debts of the respective creditors appear to be subsequent to the decease of Mr. Stevens; yet the positive testimony of Mrs. Stevens, that they were incurred prior to his decease, sufficiently establishes the liability of the estate.

4. The charges for repairs upon the Apartment House appear to have been subsequent to the 26th day of April, 1873, and by the terms of the agreement between the trustees and the executors, it is provided that such trustees should be responsible for such repairs since April 26th, 1873.

Under this agreement I think there can be no doubt of the liability of the Trustees for the repairs mentioned, notwithstanding they may have been ordered prior to the 26th day of April, 1873. Indeed the agreement itself seems to leave no reasonable doubt of that construction. The language is: " Mrs. Stevens' Trustees to be responsible as Trustees, for repairs since April 27th, 1873," evidently referring to repairs made since that period, not to such as may have been ordered since that time. These charges are therefore properly made against Mrs. Stevens.

5. The question as to the liability of Mrs. Stevens for the value of the furniture of the Apartment House, and the mode of ascertaining that value, is a question of embarrassment. The agreement above referred to, in its fourth paragraph provides as follows:—" Mrs. Stevens shall allow at cost for the furniture of the Apartment House, ordered in and after April, 1873,—and for that previously ordered at a valuation, and she shall take it."

It appears by evidence undisputed, that the furniture purchased after April 1st, 1873, cost $2,802.80, but the dispute arises in respect of the value of the furniture of the house prior to that time.

On the argument, I was inclined to the opinion that the agreement contemplated an appraisal by some persons to be selected by the respective parties; but as that seems not to have been done, the question must be determined upon the valuation which was made, and the only difference in the estimate seems to arise from the principle upon which the respective appraisers valued the property. Messrs. Taylor and Cranston appraised it at 10 per cent. less than cost, upon the proof that it was judiciously purchased at a then recent date, and upon the assumption that it was to continue in the house, as a part of the establishment, and their estimate makes the amount $7,348.56, while Mr. Colton testified that his estimate of $2,348.50 was based upon its value, removed from the house, and sold in the market as second hand-furniture.

It is quite clear that the purchase by Mrs. Stevens, and the sale by the estate of the furniture, in question, was upon the assumption that the furniture was to remain a part of the establishment, and that its estimate of value should be based upon that theory, and it seems to me that taking the circumstances and situation of

the parties into consideration, it would be a very unjust estimate to base its value upon a probable sale disconnected with the establishment, as second-hand furniture. The real question is, what was the value of the property to the estate as forming part of the establishment, or what was the value to Mrs. Stevens under the same circumstances.

As there seems to be no practical mode of correcting the different valuations, I am constrained to regard that made by Messrs. Taylor & Cranston as the true valuation, and hold that the charge of $10,967.88 on account of such furniture, is properly made against Mrs. Stevens.

6. The charge of $500 for rent of office in the Apartment House, I think under the evidence too much, as the same office was used for the benefit of the Apartment House, and that $250 would be a reasonable charge for that purpose, which I think should be allowed.

7. The charge of $450 claimed for traveling expenses of Mrs. Stevens, under her evidence should be allowed at that sum.

8. The amount paid J. B. Brewster & Co. of $1,925 for damages done to their carriages by the blowing out of a plug of the steam pipes belonging to the house, and which was paid by Mrs. Stevens, or rather retained by Messrs. Brewster, they refusing to pay because of the alleged breach of their lease with Mr. Stevens, should, I think, upon principles of equity be allowed to Mrs. Stevens.

There was, doubtless, a liability on the part of the Stevens' estate under their lease, for the damages in question; and as by agreement of October, 1873, Mrs. Stevens was to be allowed rent from May 1st, 1873, she was deprived of that rent by reason of the breach of the lease, on which the estate was liable, it seems to me that

that liability having been answered by Mrs. Stevens, by reduction of the rent, due to her by virtue of the agreement of October, she has paid so much of the estate's debt, and should be credited therefor; otherwise it would be so much diminution of her trust legacy, which the estate had undertaken to secure by the transfer of the Apartment House in question, and the rent thereof from May 1st.

9. The various charges to Mrs. Stevens, for supplies, repairs, &c., of the New York and Newport residences according to the testimony of Mrs. Stevens, were incurred before the death of Mr. Stevens, and could have been enforced against the estate, by the respective creditors, notwithstanding the bills were rendered at some time after the decease of Mr. Stevens. Yet the executors having paid them, and most of them having been incurred either before Mr. Stevens' death, or before the return of Mrs. Stevens to this country, I am of opinion that they are a proper charge against the estate, and should not be charged to Mrs. Stevens.

10. As to the charges in exhibit E, against Mrs. Stevens, for insurances of the residence at Newport, and of No. 244 Fifth Avenue, I am embarrassed somewhat by the allegation in the brief for the executors, that no exceptions to the account in that respect have been filed, while among the papers submitted to me, I find further exceptions under date of April 14th, 1875, by Mrs. Stevens, embracing these matters of insurance, and I must assume that they are properly before me for consideration, and as it appears that these charges for insurance, were upon policies issued upon the property in which Mrs. Stevens only has a life estate, and were incurred largely for the benefit of the ultimate estate, and were paid without Mrs. Stevens' authority, or intervention, I am of the opinion that the charges in that re-

spect should be disallowed, and the expenses sustained by the executors.

11. I have now reached, the final and more embarrassing questions involved in this accounting, and that relates to the $20,000 note of Mr. Melcher, and his obligation of $51,347.87 dated September 5th, 1868, and the effect of Mr. Stevens' will, and the alleged charge of said claims to Mrs. Melcher.

As the testimony of Mr. Arnold throws considerable light upon the intent of the testator in respect to these claims by charge to Mrs. Melcher in the following language, "also the further sum of $86,000"—the admissibility of this testimony is disputed by counsel for the executors, and I must therefore consider that question first.

On a careful examination of the authorities upon the question, I am of the opinion that the testimony given by the witness Arnold who drew the will, in respect to a statement of the testator, as to the purpose of the provision charging $86,000 to Mrs. Melcher, is not obnoxious to the rule prohibiting the giving of parol evidence, to explain, modify, or contradict, written instruments, but is admissible as explanatory of the intent of testator, and as giving point, and meaning to the provisions of the will, which its terms alone do not make apparent.

In *ex parte Hornby* (2 *Bradf.*, 420,) it was held that it was competent to give evidence of the testator's declaration at the time of making the will, where a will is written, and there is no one to answer the precise description of the instrument.

In that case, the legacy was given to the testator's nephew, James Hornby, son of his brother Frederick; but it appeared that his brother Frederick had no son James, but that his brother James had a son named

Frederick, and parol evidence was given to show these facts, and was held admissible, so as to give the legacy to Frederick the son of James.

The Surrogate, in that case, uses this language: " It is undoubted that all extrinsic facts are admissible in aid of the exposition of a will, and it is competent by means of extrinsic evidence to place the court in the situation of the testator, so as to facilitate, answer and ascertain his intentions."

In *Williams* v. *Craig* (8 *Cow.*, 246), it was held that evidence to show the intention of the testatrix is not objectionable on the ground of varying, or contradicting, any of the provisions of the will.

Such evidence goes to explain, independent of the will, the state of facts, of which the same is silent. In the same case on appeal (4 *Wend.*, 443,) where a new trial was granted, chief Justice SAVAGE, (at page 451,) states the principle as follows : " Is this a legacy ? If so what is the amount ? There is not a word in the will explaining it. If therefore we are ever to understand it, we must seek its explanation from parol testimony. It cannot be received to give a construction to the language of a will, but to prove circumstances from which the court may draw the inference, or presumption."

In *Hine* v. *Hine* (39 *Barb.*, 507,) parol testimony was held admissible to show that a subsequent advance was intended to apply upon a specific legacy. Mr. Justice ALLEN, (at page 512,) says : " Parol proof is competent not to define the terms of the will, but to establish the acts and intent of the testator, either in behalf of the plaintiffs, in rebuttal of the presumption of satisfaction, or of the defendants, in reply to the same evidence, in support of the alleged satisfaction."

I entertain no doubt that it is my duty, as well as province, to pass upon the question on this accounting,

of the liability of Mr. Melcher to the estate; indeed, as the indebtedness is alleged against him, he being one of the executors, it seems to me the question of his liability must be passed upon, before the accounts can be settled. (See *Merchant* v. *Merchant*, 2 *Bradf.*, 432; *Gardner* v. *Gardner*, 7 *Paige*, 112.)

The authorities cited by the learned counsel for Mrs. Stevens, to this point, refer exclusively to the well settled doctrine, that the Surrogate will not assume the power to pass upon a disputed claim against the estate, upon the final settlement, and are not applicable to a case like this.

The effect of the clause of the will referred to, the testimony of Mr. Arnold, and the inventory of Mr. Stevens, upon the said liabilities of Mr. Melcher, are full of embarrassment. Several authorities are cited by the learned counsel for the executors, to show that the claims were satisfied, but these are all cases where there is a legacy to a debtor, and the effect of such liability of the legatee is adjudged. Such are *Williams* v. *Craig* (8 *Cow.*, 246), *Tillottson* v. *Race* (22 *N. Y.*, 127), *Hine* v. *Hine* (39 *Barb.*, 509).

In *Clark* v. *Bogardus* (2 *Edw. Ch.*, 387), it was held that the gift of a legacy to a debtor will not of itself amount to a release of the debt, provided the testator's intention is left doubtful; there must be evidence clearly expressive of the intention, but it may be got at, *aliunde*. At page 390, the Vice Chancellor uses this language: " There is another class of cases where chancery has relieved the obligor from the payment of his bond, upon clear evidence of the acts and declarations of a deceased obligee, and where they amount to a relinquishment of the debt, or to the want of intention to exact payment," citing, *Burn* v. *Godfrey*, 4 *Vesey*, 6; *Eden* v. *Smith*, 5 *Id.*, 350. But an examination of these au-

thorities does not fully sustain the principle enunciated, for they are cases of legacies directly to debtors, and to the same effect substantially, is the authority in 2 *Story's Equity Jurisprudence,* sec. 1,102.

The only authority to which attention has been called, which seems to sustain the principle enunciated is referred to in 4 *Vesey,* at page 10, where Lord MANSFIELD is said to have held, in *Barrow* v. *Greenough* (3 *Vesey,* 152), that a residuary legatee could not enforce the bond given to the testator, which the testator stated to the legatee, he did not intend the obliger should pay.

The case under consideration differs somewhat from all the cases which have been cited and considered, as the legacy referred to, charged with the $86,000 liability of Mr. Melcher, was not to Mr. Melcher, but to his wife, and in that particular there seems to be an absence of parallel, and yet it is indisputable from the facts and circumstances in this case, that the testator did not intend to hold, or enforce the said claims against Mr. Melcher, but seemed to regard the estate to be given to his daughter, as though it were Mr. Melcher's, and that the amount mentioned in the will, her share of the estate, was to pay it.

The conditions referred to, that the charge should be made in case he left, surviving him, other children than Mrs. Melcher, was doubtless based upon the idea that his other children should not be charged with the result of Mr. Melcher's misadventure in respect to the Pacific Mail stock, but not to be charged to Mrs. Melcher, in case he left no other children, having equal claims upon his bounty.

In passing upon this question on this final accounting, the principles of equity seem to demand that the well-defined intent of the testator should control; and whether an action at law, by the representatives of the

tate, could be maintained to enforce the liabilities in question, against Mr. Melcher, is not a question to be passed upon in this proceeding.

It is clear that the claim has not been enforced, and there is no fund in hand received upon it; and it seems to me equally clear, that there is sufficient doubt of the liability to have justified the executors in omitting proceedings at law to enforce it, but whether they may be able to do so, at a future time, or not, is doubtful, and while I have a well-settled conviction, that under all the circumstances of the case, equity would intervene to prevent the enforcement, I do not think it proper that I should assume to pass upon the question.

With such consideration as I have been able to bestow upon the question, I am of the opinion that the said claims against Mr. Melcher, do not constitute assets of the estate.

I have examined section 13, (2 R. S., 84), which provides that any just claim which the testator had against his executor shall be included among the credits and effects of the deceased in the inventory; but whether it shall be so included, is dependent upon whether there is a just claim, and it is probable that the better practice would have been for Mr. Melcher to have stated the facts in the inventory, and left the question of liability to have been determined by future proceedings, but as it was not so included, and the counsel for Mrs. Stevens on this accounting, claims that it should have been, and that it should be adjudged to be an asset in the hands of the executors, I am not able to appreciate the force of the objection that I have no authority to pass upon that question.

Decree accordingly.