*1834.*

*MINCHIN*
*v.*
*MERRILL.*

---

MINCHIN and others, infants, &c. *v.* MERRILL and another.

---

Circumstances which constitute a gift *inter vivos* (See 1. vol. 294,) again recognized.

*It seems*, that where a debtor is particularly directed by his creditor to convert his debt into a trust fund, by setting the same aside for children, and he does so, (let the same be in the shape of securities, money or bank notes,) a trust will be created for such children, the debtor be a trustee and his administrator cannot touch the fund as assets.

Mrs. T. directed her son in law M. to sell her house and lot, which he did. She came to reside with him and his family (wife and children). M. put the avails in his business; and took a partner, but afterwards sold out to him and took his notes. In the meantime Mrs. T. repeatedly declared that the avails of the house and lot were to go to M's children and expressed a solicitude as to the same; M. had been heard to admit the same; and when he dissolved partnership he left his partner's notes (for which he had sold out) in the hands of a friend, acknowledging they were for the children, and went to the south and there died. His administrator got possession of them: But the court decreed them to belong to the children. Costs to all parties out of the fund.

---

Bill by the children of John Minchin deceased against the administrator of their father, to reach a certain sum of money which had come to his hands, upon the ground of its

*Novemb.* 21.
*1834.*

*Gift inter*
*vivos.*

belonging to the complainants at the time of the father's death and as forming no part of his personal estate. They claimed the money as a gift from their grandmother Anne Thayer, who was since dead, as being in their father's hands in trust for them.

Anne Thayer, whose administrator was likewise before the court as a party defendant, formerly resided in Boston and where she had owned a house and lot. In the year one thousand eight hundred and twenty-seven, she came to reside in New-York with her daughter and son in law, who were the parents of the complainants. On her removal, she empowered her son in law to sell the house and lot in Boston; and which sale he effected for about the sum of two thousand and five hundred dollars. The money he put in the business of a hardware store in New-York. Shortly afterwards, the defendant, Eli Merrill, became a partner with him in the store. The partnership was continued; and the money remained in the partnership stock until the month of March one thousand eight hundred and thirty, when Minchin sold out all his interest in the goods and outstanding debts to one Foster for two thousand seven hundred and fifty dollars and took Foster's promissory notes for the amount, drawn payable to himself.

Previous to this time, his mother in law, Ann Thayer, and his wife had both died. Mrs. Thayer was about eighty-six or eighty-seven years of age at the time of her death.

In the month of December, one thousand eight hundred and thirty, Minchin left his family of children in charge of a Miss Sophia White; and went to the south, where he died on the seventh day of March following intestate. He also had left with Miss White the promissory notes given by Foster. Upon receiving intelligence of his death, the defendant Merrill immediately applied for and obtained letters of administration upon his estate—having first procured the eldest son, who was then of age, to renounce in his favor; and on the fourteenth day of March one thousand eight hundred and thirty-one he prevailed upon Miss White to deliver to him the notes made by Foster and which had been since paid to him.

This led to the filing of the bill—the children claiming

the money as belonging to them and the defendant Merrill insisting that it was assets in his hands, as administrator, for the payment of debts and to be accounted for in a due course of administration.

The evidence to make out a gift consisted of the repeated declarations of Mrs. Thayer, to the effect that the proceeds of the house in Boston which had been sold and which were in the hands of Minchin she intended should go to his children and she hoped he would take care of it, at the same time expressing great anxiety about the safety of the fund. One of the witnesses, Mrs. Gray, testified, she frequently heard her speak of money in the hands of Minchin which she had given to his children; she said that Minchin held the money for the children and felt anxious about it and hoped it would be kept sacred. Another witness, Miss White, testified that she often heard Mrs. Thayer say to Mr. Minchin, " I want to know whether the money you received on the sale of my house is safe for the children, you know I always intended that money for my dear daughter's children;" and Mr. Minchin used to reply, he would keep it safe ; that the old lady was very anxious about it for she knew that Minchin was embarrassed and she said she always intended that money for the children. The last conversation the witness heard between them on the subject was after the old lady was taken ill and about three days before her death. She then called Mr. Minchin to her and said she wanted to know whether the money was yet safe for the children, and he said it was. She told him she wanted he should always keep it so; he said he would ; and she then requested he would every year add the interest to the principal.

Besides these conversations, the declarations of Minchin at other times were given in evidence. He had been often heard to say he had got the property secured for the children—had taken care of it and intended to keep it secure for them. This was while he was in partnership with Merrill. After he had sold out and held the notes of Foster and when speaking of their amount he said it was the children's money. Miss White likewise said that one evening when he came home he observed that he was afraid to have the

children's money remain any longer in his business and he had that day sold out to Foster and taken his notes, amounting to two thousand seven hundred and fifty dollars. She further testified that when Minchin went to the south, he gave Foster's notes to her, saying they belonged to the children and he wished her to keep these notes for them until he came back. Another witness, Mr. Dayton, who was examined on the part of the defendant, stated he had heard it said, and he thought he heard Minchin himself say so, that he had borrowed whatever property he had of his wife's mother and that it belonged to his children and mentioned the amount as being between two and three thousand dollars. Miss White testified further to declarations of the defendant Merrill on the same subject; that when he applied to her for the notes and insisted upon having them, she told him that Mr. Minchin had given her the notes to keep for the children until he returned and the defendant rejoined that if she did not give them up he would have to sue for them; he said he would try and collect the money on them for the children and Mr. Minchin had always told him these notes belonged to the children and that it came from their grandmother—and upon the defendant's saying all this she, the witness, gave up the notes to him. An attempt had been made to throw discredit upon Miss White's testimony by contradicting her in relation to what she said of the habits of Minchin. To a question propounded, on her cross-examination, she answered, he was not what she would call an intemperate man—he was occasionally somewhat excited by liquor, but he never used to drink at home; while a number of witnesses had been examined to prove he was often intoxicated when from home and would sometimes go home so and that this was known to Miss White. But the Vice-Chancellor did not perceive the testimony to be much at variance nor as detracting from the force of her own evidence.

Mr. *E. Paine*, for the complainants.

Mr. *J. W. Gerard*, for the defendant.

THE VICE-CHANCELLOR:—The principal question is, whether there was an effectual gift of the money by the grandmother to the children and the father a trustee of the fund for their benefit? For if so, then it would not pass to his personal representative as a part of his estate; and there can be no difficulty in following it into the hands of the defendant.

There is no pretence here of a testamentary gift. Nor can the circumstances in this case amount to a *donatio mortis causa*. It is upon the ground of a gift *inter vivos* that the claim of the children is urged. In order to render this description of gift effectual for any purpose, it is not only necessary to shew an intention to give but also an actual delivery of the thing given—there must be a parting with the possession and all control over the property by the donor and a vesting of the possession in the donee or a third person in trust for the donee. This is the well established doctrine in courts of law upon the subject and which courts of equity also are bound to regard. In addition to the cases referred to in *Taylor* v. *The Fire Department*, 1 Edwards, V. C. Rep. 294, may be cited *Hooper* v. *Goodwin*, 1 Swanst. 486, and *Gaskell* v. *Gaskell,* 2 Y. & J. 502.

I consider the evidence makes out a case of a gift executed by Mrs. Thayer, a possession parted with, and all control over the fund relinquished on her part; and that Minchin became vested with it as a trustee for his children. It is true, the evidence does not show very explicitly what passed between the parties or what their mutual understanding was at the time the money was first received by Minchin. He was empowered to make sale of the house and lot, execute the conveyance and receive the purchase money. And from these facts it is argued that he became the debtor of Mrs. Thayer for the money and not a trustee of it for his children. I consider, however, a trust was created at that time and the gift consummated. Mrs. Thayer was upwards of eighty years of age and had come to spend the remnant of her days in the family of her daughter and son in law; and their children were, next to their mother, her only descendants. She had no longer any use for the money on her own account. Her services in the family, according to

43

1834.

MINCHIN
v.
MERRILL.

testimony in this case, were an equivalent for her board; and it was natural she should wish to place the money at once in a situation where it would be of the greatest benefit to the family. She knew the embarrassed circumstances of her son in law and was, consequently, aware how the handing the money to him for the purpose of investing it in a stock of goods on his own account—thereby making it a debt against him—would be rendering the same liable for his previous debts; while, by giving the money to the children and constituting their father a trustee, with permission to employ it in trade for the benefit of his family, it could not be attended with a like consequence. The declarations of both parties, which were so constantly made, are in accordance with this view of the transaction. Mrs. Thayer declared, not only that it was always her intention to give the money to the children, but that she really had given it—and spoke of the same as their money which their father held for them; and in expressing her anxiety about its safety, it appears clearly that it arose for their sake and on their account, as owners of the fund and not on her own account as a creditor of Minchin. She intimated no design of withdrawing the money from the hands of her son in law or of reclaiming it as her own; took no measures which a creditor would have made use of who was apprehensive that his debt was not secure; and made no attempt to control the management or disposition of the fund as one belonging to himself or which was held in trust for her. Again, all the acts and declarations of Minchin show that he considered the money as belonging already to his children and not theirs merely in expectancy. He sold out his interest in the partnership when he became apprehensive his old creditors might attempt to interfere with the children's rights and the money payable by the notes he spoke of as being their money and the notes as belonging to them. The taking of them in his own name and the intention to resume the possession on his return from the south is not inconsistent with the idea of a trust on his part: for, at the time of depositing them with Miss White for safe keeping, he acknowledged such a trust.

I am not certain that his declarations and acknowledgments, though verbal, being made in good faith, as between

the children claiming to be *cestuis que trust* and the personal representative of the party admitting himself to be a trustee, may not be sufficient to prevent a devolution of the property upon the administrator: *George* v. *Howard*, 7 Price, 646. Lord Eldon, in *Ex parte Dubost*, 18 Ves. 140., speaking in reference to the gift of an annuity which was claimed against an executor, observed that although in one sense it might be represented as the testator's personal estate, yet the testator had committed to writing what seemed to be a sufficient declaration of his holding this part of the estate in trust for the annuitant. The Lord Chancellor had, in the same case before said, " that upon an agreement (voluntary) to transfer stock, this court will not interpose, but if the party had declared himself to be the trustee of that stock, it becomes the property of the *cestui que trust* without more and the court will act upon it." This principle may be applied here, even supposing it to have been a debt originally from Minchin to Mrs. Thayer. As a debtor, it appears to me that it was competent for him, with Mrs. Thayer's assent and in conformity with her declared wishes, to convert the money owing by him to her into a trust fund for the benefit of his children, by setting apart securities or money in bags or bank notes in his possession, designating it to be trust property, and that such an act on his part would preclude his personal representative from claiming the property or fund as assets of his estate : *Powell* v. *Cleaver*, 2 Br. C. C. 500. 515. I go further. I consider no violence is done to the evidence by drawing the conclusion that there was a completely executed gift by Mrs. Thayer and such a vesting of the property in trust for the children that her administrator, upon evidence of what had taken place, could not have recovered the money in an action against Minchin as a debt due from him.

The complainants are entitled to the money as a fund which belonged to them in their father's hands—the same not having formed a part of his estate. The money is in court ; the share of the adult complainant may be paid over to him, and those belonging to the infant defendants must remain invested until they come of age, while the interest

only (unless he gives the requisite security) is to be paid to their guardian.

As to costs. The complainants claim them against the defendant Merrill; while he insists upon being entitled to his costs out of the fund. He became administrator with the assent of one of the complainants who was competent to give such sanction. The appointment of an administrator was, in all probability, necessary for the purpose of collecting the money from the maker of the notes. They were made payable to Minchin; he does not appear to have endorsed or negotiated them; and there might, therefore, have been a difficulty in enforcing payment except through the medium of a legal representative of the deceased payee. The defendant appears to have acted in good faith and from good motives even towards the children. At the time he applied for the notes, he avowed his object to be the collection of the money for the children, provided, as it must be understood, that they should turn out to be the owners and entitled to it; and when he got the notes into his possession and received the amount of them, it was a difficult question for him to determine whether he would be safe in paying the money over to the children instead of claiming to hold it as assets for the payment of the father's debts. In some measure he stood in the situation of a trustee who requires the direction of the court for his protection; and under all circumstances, it is not unreasonable to allow the defendants, as well as the complainants, their costs, out of the fund.