## In the Matter of BENJAMIN COOPER, Deceased.

*(Surrogate's Court, Cattaraugus County, Filed January, 1894.)*

1. EXECUTORS, ETC.—DISPUTED CLAIM.

    The surrogate, upon an accounting by the personal representative of a deceased executor, may determine the validity of a claim of such deceased executor against the estate of testator.

2. CONTRACT—IMPLIED PROMISE.

    A promise to pay for services will be implied, unless a presumption arises from the relation of the parties that they were rendered without any expectation of compensation.

3. TRUST—SPECIFIC PURPOSE.

    Delivery of money to a person, to be applied to specific purposes, to which he assents, creates a valid trust.

PROCEEDINGS for a judicial settlement of the accounts of the executors.

Thrasher & Leonard, for Ezra Cooper, the surviving executor; J. M. Congdon, for administrators of Henry H. Atwell, the deceased executor; J. J. Inman and W. S. Thrasher, special guardians, *pro se.*

DAVIE, S.—Benjamin Cooper died at the town of Perrysburgh on the 14th day of February, 1892, at the age of 88 years, leaving him surviving no widow, children or descendants. His will, bearing date July 9, 1891, was admitted to probate May 2, 1892, and letters testamentary thereupon issued to Ezra Cooper and Henry H. Atwell, the executors therein named, who continued to manage and control the estate,, acting together, until the death of the executor, Atwell, on the 19th day of September, 1892. Shortly after Atwell's death his widow and son were appointed administrators of his estate. The surviving executor and the administrators of the estate of the deceased executor present their petition for judicial settlement herein. At the time of the death of the testator, Atwell was indebted unto him upon a promissory note, dated June 5, 1891, for the sum of $300 and interest, due one year after date, for which it is claimed that the representatives of the Atwell estate should account. On the contrary it is alleged that during the last year of testator's life Atwell rendered services for him greatly exceeding in value the amount of such note, and for which the administrators present a claim, and seek to have the same adjudicated upon this accounting. On the return of the citation the parties opposed to the allowance of the claim moved that this proceeding, in so far as it related to such claim,, be dismissed upon the ground that the Surrogate's court had no jurisdiction to try the disputed question of fact involved in the determination of the claim, and that it was not a personal claim, within the general scope and view of section 2739 of the Code. The motion was denied, but if it should be determined upon a careful examination that the Surrogate's Court had no jurisdiction, then the proceedings should be to that extent dismissed, and the parties left to their remedy by action or by a reference under

the statute to determine the controversy between the two estates. The section of the Code referred to provides that—

"Upon a judicial settlement of the account of an executor or administrator he may prove any debt owing to him by the decedent; where a contest arises between the accounting party and any of the other parties respecting any property alleged to belong to the estate, but to which the accounting party lays claim, or respecting a debt alleged to be due by the accounting party to the decedent, or by the decedent to the accounting party, the contest must be tried and determined in the same manner as any other issue arising in the Surrogate's Court." Code, section 2339; Laws 1893, c. 686, section 2731.

Had Atwell survived, no doubt would have existed in regard to the authority of the Surrogate's Court upon this accounting to have determined the extent of his indebtedness to the estate or the indebtedness of the estate to him. Does the fact of his death, and that he is represented upon this accounting by his personal representatives, deprive the Surrogate's Court of jurisdiction to determine precisely the same questions? No authorities are cited bearing directly upon this question, but it has been held that the Surrogate's Court has jurisdiction upon judical settlement to hear and determine all claims in which an executor is interested, and the circumstance that he is interested jointly with others in the demand does not affect the authority to adjudicate with regard to it, Estate of Eisner, 5 Dem. 383; that a surrogate has authority to determine whether a claim against an executor is discharged by will, Stevens v. Stevens, 2 Redf. 265; that, where an executor claims the right to retain out of the assets of the estate a certain sum of money as belonging or due to him, the surrogate has jurisdiction, whether such right depends upon legal or equitable principles, Boughton v. Flint, 74 N. Y. 476; that the executor acquired an additional interest in the claim sought to be established after he became executor does not affect the jurisdiction, Shakespeare v. Markham, 72 N. Y. 400; that the surrogate has jurisdiction to pass upon and settle claims held by the executor

or administrator in a representative capacity against the estate as well as one held by him individually, and the fact that others were joined as administrators of one estate, while he was sole administrator of the other, was immaterial, Neilley v. Neilley, 89 N. Y. 352. While none of these cases are directly in point, they evidence a design on the part of the courts to so construe and apply this section 2739 of the Code as to clothe the surrogate with ample authority on judicial settlement to determine all property rights between administrator or executor and the estate which he represents and which are necessary to be determined in order to secure a full adjustment of all matters connected with the trust. Upon qualifying and assuming control of the assets of the estate as executor, Atwell incurred the obligation of properly administering upon and duly accounting for such assets, and this obligation is not affected by the fact of his death. The statute declares that the amount of his indebtedness to the estate in an asset to be accounted for as so much money in his hands (2 Rev. St. 84, section 13; Baucus v. Stover, 89 N. Y. 1), but the extent of such indebtedness depends upon the validity of his personal claim; hence, it becomes indispensable to pass upon such claim in order to determine whether the representatives of Atwell's estate should account for the amount of the note as assets. The conclusion, therefore, seems inevitable that the provisions of section 2739 of the Code are sufficiently comprehensive to confer jurisdiction in a case of this character, and that the claim should not be dismissed for lack of jurisdiction, but disposed of upon its merits.

The evidence clearly shown that during the last year of testator's life Atwell rendered important and necessary services for him. About the 1st of July, 1891, testator deemed his condition such as to require an attendant at night. Accordingly Atwell began staying with, and attending upon him, during the night time, and continued doing so until about the 10th day of September, when he began staying with testator both day and night; and from that time to testator's death Atwell was in attendance upon him substantially all the time, and during

that period Atwell had, to a great extent, the responsibility of administering medicines to testator, slept in the same room with him, attended his calls, waited upon, nursed, and cared for him. The services were to some extent of an unpleasant and disagreeable nature. The testator was afflicted with a urinary trouble, rendering the use of a catheter frequently necessary, which operation was usually performed by Atwell. While the evidence clearly discloses the meritorious character of the services, it is not so easy to discover therefrom a satisfactory and legitimate measure of the value of such services. Mrs. Waterman testified that she had been a nurse for 30 or 40 years, and that she knew the value of the services rendered by Atwell and that they were worth from five to six dollars per day; but the cross examination of this witness established her utter incompetency to speak as to the question of value. The evidence of the witness Vosburgh was in much the same situation. While he testified that the services were worth five dollars per day, it appeared that his opportunities for becoming familiar with the value of that kind of services were confined to a single transaction, where he cared for, boarded, and nursed a sick man for three weeks and received five dollars for so doing. The attending physician was unable to give any opinion whatever as to the value of the services. Dr. Rugg, who knew in a general way the condition of the testator, testified that if the testator was entirely helpless, requiring attention all the time, the services were worth from four dollars to five dollars per day; but assuming that from the middle of July to the middle of September Atwell merely slept there nights, called occasionally to wait upon the testator, and during the last five months had assistance in caring for him, and that the testator was not confined to his bed until within a short time before his death, but was up and dressed, such services would be worth from two dollars to two dollars and fifty cents per day. The latter assumption is much more in conformity with the actual facts. The evidence as to testator's condition, and what Atwell actually did, under Dr. Rugg's estimate of the value of the services, would not to any extent justify or sustain a finding that such services were worth to exceed

two dollars and fifty cents per day while Atwell was in attendance both day and night, and one-half that sum when there nights only. Testator was not entirely helpless, and did not require attention all the time. He was up and dressed in the day time, and able to go to the table for his meals until shortly before his death. This makes the total value of the services $472.50. But it is urged upon the part of the contestants that, whatever the value of the services, they were rendered under such circumstances, and the relations existing between Atwell and the testator were of such a character, that the legal presumption is that they were rendered gratuitously. Ordinarily, where one receives the beneficial services of another, the law implies a promise to pay what such services are reasonably worth; but such presumption may be entirely overcome by the circumstances of a particular case. The legal presumption of an obligation to pay is very weak when the services rendered are of such a character that, from the relations existing between the parties, they evidently were prompted by motives of affection and reciprocal obligations. If the circumstances are such as to lead to the conclusion that the services were rendered gratuitously the law will not imply an obligation to pay. It has been distinctly held that, however valuable the services, one cannot render them with a tacit understanding that no pecuniary charge is to be made therefor, and afterwards recover upon a quantum meruit. Moore v. Moore, 3 Abb. Dec. 303; Williams v. Hutchinson, 3 N. Y. 312; Ross v. Ross, 6 Hun, 182. While no doubt exists in regard to this legal proposition, the evidence by no means justifies its application to the case at bar. It is true that the relations between Atwell and the testator were, and for many years had been, of a friendly character. Testator was accustomed to call upon Atwell, from time to time, for advice and assistance and occasionally spoke of him as his boy; yet the evidence does not disclose such a state of reciprocal obligations between the parties as to render it presumable that either Atwell or testator understood that these services were being rendered without expectation of pecuniary

compensation. The statements and declarations of testator imply a contrary intent. While the amount of compensation was not fixed by the agreement of the parties, the evidence shows that testator expected to pay what such services were reasonably worth. Shortly after the commencement of the services, testator stated to Atwell, in the presence of Mrs. Waterman, that he had a $1,000 mortgage and a $500 note, and that he was going to fix it so that Atwell could collect them; and the $1,000 he was going to give to Atwell and the $500 to Mrs. Waterman, because of the services they had rendered and the kindness they had shown him. He repeated this statement to Atwell on several occasions while the services were being rendered. On another occasion testator said to Atwell that he wanted to and was going to pay him well, and he thought it would be right that he should allow the $1,000 for his services. The entire evidence in the case is susceptible of no other construction than that it was the mutual expectation that Atwell should receive a reasonable compensation. This case seems to come fairly within the scope of Markey v. Brewster, 10 Hun, 16.

There is, however, another feature of this case requiring careful consideration. It appears that during the time Atwell was caring for the testator he delivered to Atwell the sum of $1,500 in money, and the circumstances attending such delivery are disclosed by the cross-examination of the witness, Mrs. Wateerman:

"Q. Did you hear a conversation between Atwell and Mr. Cooper, and what Mr. Cooper told Atwell to do with this money? A. He told him to take eight hundred dollars—five hundred dollars to give to Mrs. Abbott, one hundred dollars to her mother, two hundred dollars to be sent to Washington Territory to her sister and brother. Q. What about Mrs. Lincoln? A. Was to have one hundred dollars. Q. Anything said about what was to be done with the balance of the money? A. He told him. Q. What did he say? A. He told him to keep the remainder for my use. Q. You heard Mr. Cooper tell him that? A. I did. Q. What did Mr. Atwell say? A. He said he would do it; they should be done according to the request."

Very soon after the receipt of the money Atwell paid to the various persons designated by the testator their respective amounts, and the balance he had in his possession at the time of testator's death. It is claimed on part of the surviving executor that such transaction merely constituted Atwell an agent to disburse this money for the testator, and that such agency was terminated by testator's death; that the portion of this fund which remained in Atwell's hands at the death of testator constitutes a part of his estate, and that Atwell's representatives should account for the same. On the contrary, it is asserted that this transaction, construed in the light of all the attendant circumstances, constituted a valid trust, and that the title to such fund vested in Atwell as trustee, with Mrs. Waterman as *cestui que trust,* and that Atwell's representatives are under no obligations to account to any one but her therefor. It is undoubtedly true as a legal proposition that if it was the intention of the testator to constitute a mere naked deposit of this money in the hands of Atwell, thereby creating only an oral agency, coupled with no interest on Atwell's part, such agency was revocable at the pleasure of testator, and upon his death ceased by operation of law (Story, Ag. 463-488); but if it was the design of testator to part with the title to and all control over this fund, to place it absolutely and unqualifiedly in the hands of Atwell, to use for the benefit of Mrs. Waterman, then the transaction was not in any manner affected by testator's death. It will be observed that there was no legal impediment to the creation of a trust of the character claimed to exist in this case. A trust of personalty is not within the statute of uses and trusts, and may be created for any purpose not forbidden by law (Gilman v. McArdle, 99 N. Y. 451); and in order to constitute a trust in respect to money or personal estate, no formal or written agreement is necessary (Day v. Roth, 18 N. Y. 448; Gilman v. McArdle, 99 N. Y. 451). In construing this transaction it is competent and proper to take into consideration the attendant facts and circumstances evidencing the motive and intent of the testator. Day v. Roth, 18 N. Y. 448. If the circumstances clearly indicate an

intention to create such a trust, it is sufficient. Minchin v.
Merrill, 2 Edw. Ch. 333. In seeking to discover the intent of
the testator, it will be necessary to refer to the relations existing
between the parties. It appears from the evidence that Mrs.
Waterman began residing in the family of the testator before the
death of his wife, which occurred in February, 1887, and from
that time continued to reside with the testator in the capacity of
housekeeper until his death. She assisted to some extent in
nursing and caring for testator, who frequently expressed his
appreciation of her kindness, and a design to compensate her
therefor. After the making of his will, and evidently about the
time of delivering the money in question to Atwell, testator ex-
pressed an intent to give to Mrs. Waterman the proceeds of a
$500 note, assigning as his reason for so doing that she had ren-
dered services and been kind to him. This note, however, was
never transferred to Mrs. Waterman. Moreover, at the time
of delivering the money to Atwell, testator expressed no inten-
tion of retaining any control or jurisdiction over it. He did
not retain the right to direct at what time or in what manner it
should be used for Mrs. Waterman, and it does not appear that
he ever made any suggestion in relation to it after delivering it
to Atwell. If the testator had, at the time in question, deliv-
ered the money to Mrs. Waterman herself, telling her to keep it
for her use, it would have constituted a valid gift *inter vivos,*
and transferred the absolute title to Mrs. Waterman, and neither
testator nor his personal representatives could have recovered
any part of it. Has not the title passed just as absolutely by a
delivery of the fund to Atwell for the use of Mrs. Waterman?
In the case of Gilman v. Ardle, above cited, it was shown that
Mrs. Gilman placed in the custody of the defendant about
$2,000, and directed him to use the money for the support and
maintenance of herself and husband as long as they lived, and
after the death of the survivor to pay their funeral expenses,
and erect for them suitable monuments, and expend the residue
in masses for the repose of the souls of herself and husband. It
was claimed by the plaintiff in that case that the transaction cre-

ated a mere agency, revocable at the pleasure of Mrs. Gilman, and that no title to the fund passed to the defendant, and that, in consequence, the agency was revoked by her death; but the Court of Appeals held that such was not the case; that a valid trust was thereby created, saying:

"Where money is paid by A to B on the promise of B to invest or employ it in a definite, specified and lawful manner, a valid contract is made; and if there is an ascertained beneficiary interested in the performance of the agreement, he can, after the death of A, enforce it as a trust."

In the case at bar, testator, after having frequently acknowledged the obligation he was under to Mrs. Waterman, and evidently desiring to make some certain and definite arrangement for her compensation, delivered this $600 to Atwell, directing him to use it for her. Atwell accepted the money, agreeing, unequivocally, to use the fund for that express purpose. Under the authority above cited, it is difficult to conceive of any reason why Atwell was not absolutely obliged to account to Mrs. Waterman for the entire sum. The cases are numerous illustrative of the character of transactions which the courts have adjusted to constitute valid trusts. Where S. deposited money in trust for M. and K., distant relatives, who were ignorant of it, S. retaining the bank book and drawing one year's interest, it was held that a valid trust was created. Martin v. Funk, 75 N. Y. 134. Where C. F. deposited money in the bank to her own credit, "in trust for C. F. M.," it was held to be the money of C. F. M. Millspaugh v. Putnam, 16 Abb. Pr. 380. A. delivered a package to B., containing money, a bank book and a memorandum stating where he desired to be buried, and how the balance of his property was to be distributed. Held to be a valid trust. Pierce v. Bank, 129 Mass. 425. Where one took a bank book at the direction of his aunt, who said: "Now, keep this, and if anything happens to me, bury me decently and put a headstone over me, and anything that is left is yours"—it was held that a trust was created. Curtis v. Bank, 77 Me. 151. Also, in a case where a testator transferred certain bank shares

to himself as trustee for his daughter, she being ignorant of
the transaction, and he taking the dividends.    Cummings v.
Bramhall, 120 Mass. 552.   Also where one delivered a bank book
with an assignment of the deposit to E. on the agreement that
E. should pay such sums to her as she might want from time to
time during her life, and the balance to her son.   Davis v. Ney,
125 Mass. 590.   In the case of Mabie v. Bailey, 95 N. Y. 206,
the testator made a deposit in a savings bank in his own name
as trustee for the plaintiff, took a pass book in which the ac-
count was so entered, exhibited the pass book to plaintiff's
mother with other pass books containing entries of a similar
character in favor of herself and other children, and when asked
why he did not let them have the money then, said it would do
them more good thereafter, and in subsequent conversations
these deposits were recognized by the testator as a provision for
the family.   It was held that the evidence clearly showed an
intent on part of the testator to create a trust for the benefit of
the plaintiff.

It is, however, urged on part of the contestants that, assuming
this transaction to constitute a valid trust, there is another reason
why the representatives of the Atwell estate should account for
at least a part of this fund.   It appears from the evidence that
after the death of the testator, and on or about the 17th of May,
1892, Mrs. Waterman and Mr. Atwell had an adjustment of
their affairs, and Atwell then paid over to her the sum of $500,
taking her receipt therefor, which stated that such payment was
in full satisfaction of all claims which Mrs. Waterman had
against him, and in full settlement for all sums which Atwell
held for her, in trust or otherwise, and in particular from Ben-
jamin Cooper.   It does not appear from any other source just
how much of this fund Atwell had in fact paid over to Mrs.
Waterman, and it is claimed that it inferentially appears from
the receipt that he settled with her in full for this $300, thereby
makng a gain for himself in contravention of the well-estab-
lished principle that trustees are not permitted to retain any
profits or advantage to themselves through their dealings with

the trust fund. Citing Dunl. Paley Ag. 51; Davoue v. Fanning, 2 Johns. Ch. 252; McMurray v. McMurray, 66 N. Y. 175. But if we are right in the conclusion already reached, that the title to this fund passed absolutely from the testator, then Atwell was accountable only to the *cestui que trust* for the manner in which he administered the trust, and not to any extent to the representatives of the testator. The conclusion reached, therefore, is that the representatives of the estate of Atwell are entitled to recover from the estate of testator the difference between the amount of the note above referred to and the value of the services rendered by Atwell to the testator as above determined. A decree will be entered accordingly.